UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GARY L. BATTLE and LESLIE R. BATTLE,

    Plaintiff(s),

v.

STATE FARM FIRE & CASUALTY CO.,

    Defendant(s).
_____/

Case No. 04-71923

Honorable Nancy G. Edmunds

**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [7]**

    This is an insurance dispute.  Plaintiffs Gary and Leslie Battle allege that Defendant State Farm and Casualty Company is liable under their insurance policy for damages caused by mold.  Defendant has filed a motion for summary judgment arguing that the claims are not timely and the damage is excluded under the contract.  Because genuine issues of material fact exist and for the reasons stated in more detail below, Defendant's motion is DENIED.

**I.    Factual and Procedural History**

    Plaintiffs Gary and Leslie Battle own a residence located at 13375 Lenmore in Belleville, Michigan ("the Lenmore residence").  On July 28, 1999, Defendant State Farm and Casualty Company issued a homeowner's insurance policy to Plaintiffs for the Lenmore residence.  (Def.'s Ex. A "1999-2000 Ins. Policy No. 82-J1-1486-3.")

    In October of 1999, Plaintiffs filed a claim with Defendant after they found a puddle of water in their kitchen.  (Compl. ¶¶ 6-7.)  Sunglo Restoration Services ("Sunglo") performed

the repairs. (Id. ¶¶ 9-10.) Then, on June 20, 2000, Defendant reimbursed Plaintiffs. (Def.'s Ex. B. "Check No. 504 515 405 Q" and "Check No. 504 515 406 Q.")

In Plaintiffs' insurance contract, there is a "LOSSES NOT INSURED" section. (Def.'s Ex. A "Form FP-7955" at 9.)[1] The first paragraph states that Defendant "do[es] not insure for any loss to [the Lenmore residence] which consists of, or is directly and immediately caused by" one of the named exceptions in the paragraph which, in the initial 1999 version, included "mold, fungus, or wet or dry rot." (Id.)

The second and third paragraphs in the "LOSSES NOT INSURED" section are similar to the first. The second paragraph states that Defendant does not provide "any coverage for any loss which would not have occurred in the absence of" any of the explicitly named circumstances in the paragraph. (Id.) The third paragraph states that Defendant does "not insure under any coverage for any loss consisting of" any of the named situations (*e.g.*, defects in workmanship). (Id. at 10-11.) Paragraphs one and three end with the following statement: Defendant *does* insure "for any resulting loss" from one of the exceptions "unless the resulting loss is itself a Loss Not Insured by this Section." (Id. at 11.)[2]

---

[1] In the preceding section, the "LOSSES INSURED" are set out. (Form FP-7955 at 7.) There are two "covered" items: "the Dwelling," *i.e.*, the Lenmore residence and "Personal Property." (Id.) Both provisions state that Defendants "insure for accidental direct physical loss to the property" (in general for the Dwelling and under the named circumstances for Personal Property) except as provided in the "LOSSES NOT INSURED" section. (Id.)

[2] All paragraphs have similar language regarding the general limitations for the named events. Specifically, paragraphs one and two both state that the loss is not covered regardless of "whether [it] occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces or occurs as a result of" one of the named situations. (Form FP-7955 at 9-10.)

In addition, as noted above, the first paragraph states that the loss is not covered when it is "directly and immediately caused by" one of the named situations. (Id. at 9.)

Later, in a notice about the policy language, Defendant alerted Plaintiffs that there was an amendment regarding mold. (Pls.' Ex. H "Form FE-5398.") Specifically, the first paragraph was amended so that "mold, fungus, or wet or dry rot" eliminated the word "mold." (Id.) In addition, in the second paragraph, a section for "Fungus" was added. (Id.)[3]

---

Similarly, the second paragraph states that "[Defendant] do[es] not insure for such loss regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss . . . ." (Id. at 10.)
    Paragraph three is somewhat different. It states that

> [Defendant] do[es] not insure for loss described in paragraphs 1 and 2 [of this section] regardless of whether one or more of the following: (a) directly or indirectly cause, contribute to or aggravate the loss; or (b) occur before, at the same time, or after the loss or any other cause of the loss[.]

(Id.) It is noteworthy that this language relates back to the "losses" from the other paragraphs in the section (*i.e.*, paragraphs one and two), but does not, on its face, affect the "losses" in that paragraph (*i.e.*, paragraph three).

[3]   This section stated that

> [Defendants] also do not cover:
> (1) any loss of use or delay in rebuilding, repairing or replacing covered property, including any associated cost or expense, due to interference at the residence premises or location of the rebuilding, repair or replacement by fungus;
> (2) any remediation of fungus including the cost to:
>     (a) remove the fungus from covered property or to repair, restore or replace that property; or
>     (b) tear out and replace any part of the building or other property as needed to gain access to the fungus; or
> (3) the cost of any testing or monitoring of air or property to confirm the type, absence, presence or level of fungus, whether performed prior to, during or after removal, repair, restoration or replacement of covered property.

(Form FE-5398.)
    The contract was also amended to add a definition of "fungus" as "any type or form of fungus, including mold, mildew, mycotoxins, spores, scents or byproducts produced or released by fungi." (Id.)

According to Plaintiffs' 2002-03 bill, this amendment was effective on July 28, 2002. (Pls.' Ex. H "Plaintiffs' July 28, 2002 Bill.")

In January of 2002, Plaintiffs wrote a letter to Defendant stating that they "discovered that [their] house has a great amount of mold that may be toxic" and made a request for a claim to be opened. (Def.'s Ex. G "Letter from Leslie Battle to Defendant (January 31, 2002).") The request was officially denied on December 29, 2003. (Def.'s Ex. H "Letter from Defendant to Plaintiffs (December 29, 2003).")

On March 29, 2004, Plaintiffs filed a complaint alleging that (i) the policy applies to the mold and Defendants have a duty to cover the losses; (ii) Defendant breached a duty of good faith and fair dealing; (iii) Defendant was negligent; and (iv) a violation of MICH. COMP. LAWS § 500.2006. The parties stipulated to a dismissal as to counts (ii) and (iii) and then later as to count (iv). *See* April 11, 2005 Order; May 11, 2005 Order. Defendant had earlier filed a motion for summary judgment addressing all counts. With respect to counts (ii) through (iv), this motion is moot and the Court need not address Defendant's arguments on these claims. Count (i) is construed as an allegation that Defendant has breached the insurance contract. The Court now turns to this question.

## II.  Standard of Review

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as

a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252.

The court must believe the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

**III. Analysis**

Defendant makes a variety of arguments why it did not breach the contract: (1) the claim was not timely; (2) mold damages are not covered under the contract; (3) damages from defective workmanship are not covered under the contract; and (4) damages from water seepage are not covered under the contract. The Court addresses each argument in turn.

**A. Timeliness of Plaintiffs' Claim**

Defendant argues that Plaintiffs did not meet a condition in the insurance contract and, thus, its duty to perform (*i.e.*, pay for any damages) never arose. The condition it points to deals with the timing of "Suits against [Defendant]." It states as follows: "No action shall be brought unless there has been compliance with the policy provisions. The action must be started within one year after the date of loss or damage." (Form FP-7955 at14.)

Plaintiffs argue that this clause is not valid in light of Michigan law. They rely on MICH. COMP. LAW § 500.2833(1)(q) which provides that

> (1)  Each fire insurance policy issued or delivered in this state shall contain the following provisions: . . .
>   (q)  That an action under the policy may be commenced only after compliance with the policy requirements. An action must be commenced within 1 year after the loss or within the time period specified in the policy, whichever is longer. The time for commencing an action is tolled from the time the insured notifies the insurer of the loss until the insurer formally denies liability.

If this clause must be included, it follows that an insurer cannot insert another clause which changes the mandatory requirements. *See Randolph v. State Farm Fire & Cas. Co.*, 580 N.W.2d 903, 904-05 (Mich. Ct. App. 1998)(holding that the exact tolling provision considered here was "absolutely void pursuant to MICH. COMP. LAWS § 500.2860").

Plaintiff has not shown that the contract at issue here is a "fire insurance policy" and, if it is, the provisions must apply to all parts of the contract. The contract does provide coverage for the Lenmore residence unless the damage falls within the "LOSSES NOT INSURED" (which does not include fire) and, in addition, explicitly covers "personal property" for damages caused by "fire or lightning." (Form FP-7955 at 7, 9-11.) However,

6

the policy also covers Plaintiffs' property in other situations.[4] It is not clear whether the mandatory provisions must apply to all types of losses or just those caused by the fire.

The only difference between the two clauses is that the statute explicitly requires the time between a claim's notification and denial to be tolled. The Michigan Supreme Court has held, however, that the tolling provision is interpreted into contracts that contain the provision considered here. *See Tom Thomas Org., Inc. v. Reliance Ins. Co.*, 242 N.W.2d 396, 399-400 (Mich. 1976)("The appropriate resolution is to allow the contractual period of limitation to run from the date of the casualty or, as provided in this policy, discovery of the loss, but to toll the running of the limitation from the time the insured gives notice until the insurer formally denies liability."); *accord In re Certified Question, Ford Motor Co. v. Lumbermen's Mutual Casualty Co.*, 319 N.W.2d 320 (1982). Thus, because the clauses are identical for practical purposes, the Court need not decide the scope of MICH. COMP. LAWS § 500.2833(1)(q).

The time period does not begin, as Plaintiffs contend, until the insured's claim is denied. The plain language states that it is measured from the "loss" (and, as noted above, is tolled during the consideration of a claim). The time period would start to run from the denial if a notification was immediately submitted after a loss. If, however, there was a delay between the loss and the notification, this time must be added to the time between the denial and the filing of the suit.

---

[4] The provision Plaintiffs rely upon is part of Michigan's Insurance Code of 1956 which contains a chapter dealing with "Fire Insurance Contracts" (Chapter 28) and "Basic Property Insurance" (Chapter 29). The latter explicitly includes the former. *See* MICH. COMP. LAWS § 500.2901(a)(i). There does not exist a provision in Chapter 29 that is similar to § 500.2833(1)(q).

The starting point is to determine when the "loss" occurred. Unlike most other types of damage claims, a problem that is caused by mold develops slowly. That is, because the damage is not immediate, it is difficult to determine the exact point when a "loss" occurs. It is doubtful that every crack and chip would be considered a "loss" that is covered under the contract.[5]

What first appears as a minor crack, however, may eventually turn into serious structural damage. *See, e.g., Elsey v. Hastings Mut. Ins. Co.*, 411 N.W.2d 460 (Mich. Ct. App. 1987). In these situations, if the time begins to run at the first sign of damage, the insured is put into a difficult situation.[6] He must report even the slightest change in the property (which would likely result in an unmanageable amount of claims for the insurer) or lose the possibility of bringing a cause of action on a denied claim.

In this case, however, the mold, in and of itself, may be considered a "loss." Plaintiffs testified that they saw mold when Sunglo was repairing the residence. (Def.'s Ex. J "Leslie Battle Dep." at 65; Def.'s Ex. K "Gary Battle Dep." at 54.) This was sometime in 1999.[7] It

---

[5] The contract does not define the term "loss." As noted, it only states that "[Defendant] insure[s] for accidental direct physical loss to [the Lenmore residence] except as provided in SECTION I – LOSSES NOT INSURED." (Form FP-7955 at 7.)

[6] Defendant cites to *Elsey v. Hastings Mut. Ins. Co.* for the proposition that a "loss" occurs at the first sign of damage. This is not an accurate interpretation of the case. The court there was interpreting the phrase "inception of the loss"–i.e., the cause–which is sometimes different from the time of the actual "loss." *See Elsey*, 411 N.W.2d at 461-62. Moreover, the *Elsey* court did not, as Defendant contends, determine that an insured's awareness is not relevant. Instead, the court found "that the 'inception of the loss,' i.e., (in plaintiffs' terms) knowledge of the cause of the loss, could have taken place no later than [1982,]" or the date the plaintiffs should have known about the cause; and, thus, the time for filing a claim had passed. *Id.* at 462.

[7] The exact time is unclear because neither party submitted evidence to show when the repairs occurred. Although Defendant submitted portions of Plaintiffs' deposition

appears, however, that Plaintiffs reasonably believed Sunglo repaired all losses associated with the water damage. After later testing, Plaintiffs realized there was a problem–either the mold was never removed, it came back, or a new problem emerged. Based on the evidence presented by the parties, the Court cannot determine this date. Defendant has the burden to prove that the statute of limitations precludes Plaintiffs' claim. Thus, its motion for summary judgment cannot be granted on this issue.

**B. Mold Exclusion Clause**

As noted above, the initial contract had a provision about mold that was amended in July of 2002. Plaintiffs allege that the initial contract did not exclude all claims based on mold and the amendment does not apply to their claim. Defendant does not dispute this latter point. Instead, it claims only that the initial contract excludes their claim.

Were it not for the last sentence of paragraph one in the "LOSSES NOT INSURED" section, this question would be easy. The first sentence of that paragraph states that "*any loss*" that is "directly and immediately caused by" mold is not part of Plaintiffs' coverage. (Form FP-7955 at 9.) The final sentence seems to contradict this statement, however, when it says that Defendant "do[es] insure for any resulting loss from [mold] unless the resulting loss is itself a Loss Not Insured by this Section." (Id. at 10.)

To be consistent, the last sentence may be read as a qualification on the "any loss" referred to in the first sentence–i.e., "any loss" in the first sentence may mean "any loss" that is named in the "LOSSES NOT INSURED" section.

---

transcript, the Court was not able to review enough of the testimony to determine what date Plaintiffs admit to seeing the mold.

9

The problem with this interpretation is that some of the enumerated "LOSSES NOT INSURED" are specific losses (*i.e.*, general causes that also name the part of the covered property that become damaged), but others only list a general cause. A specific loss is, for instance, the freezing of the plumbing system when the house is vacant. The interpretation discussed above would apply as follows: The plumbing system would not be covered regardless of whether the pipes froze (when the house was vacant) because the weather was unseasonably cold, or because the homeowner forgot to turn on the heat, or because a door was left open, etc. If, on the other hand, the pipes fell through the floor and damaged other parts of the residence because they became frozen, the damage would be covered so long as it was not named as a "LOSSES NOT INSURED."    T     h     e interpretation breaks down for the provisions that only list a general cause. For example, mold may damage the drywall, the plumbing system, the appliances (assuming they are part of the covered property), etc. There would seemingly be no situation (or type of damage) that is not included and, thus, where the last sentence could be applicable. While it is possible that this is the intended interpretation, it is not clear: only a few of the exclusions listed in paragraph one are specific losses which would therefore render the last sentence virtually meaningless.[8]

---

[8] This broad interpretation of the exclusions is somewhat reinforced by later provisions in the contract. Specifically, the second paragraph does not list any specific losses, but instead focuses only on the cause. Thus, for this section, it is only logical that all of the property subject to the contract (*i.e.*, any part of the Lenmore residence) is not insured when the damages were caused by (or partially caused by) any of the listed situations. Transferring this logic to paragraph one, all of the property would be covered unless otherwise noted–*e.g.*, the plumbing system.

The reverse of this interpretation–*i.e.*, the first sentence qualifies the last–is also plausible. This would work as follows: The first sentence deals only with losses that are "directly and immediately caused by" the listed scenarios; the last sentence may therefore be read as not contradicting the first sentence if it only applies to "any resulting loss" that is not "directly and immediately caused by" mold.

It must be noted that, using either interpretation, there is no relevant difference between paragraph one and paragraph two in this section. It is unlikely that a contract would separate exclusions into different categories for no reason. Moreover, either interpretation would practically eliminate any purpose for the final sentence. In other words, it appears that the first and last sentences of paragraph one conflict. *See Klapp v. United Ins. Group Agency, Inc.*, 663 N.W.2d 447, 453 (Mich. 2003)("An insurance contract is ambiguous when its provisions are capable of conflicting interpretations. Accordingly, if two provisions of the same contract irreconcilably conflict with each other, the language of the contract is ambiguous.")(citations omitted).

The Court therefore finds that the contract contains an ambiguity. "[T]he meaning of an ambiguous contract is a question of fact that must be decided by the jury." *Id.* Summary judgment on this ground is therefore inappropriate.[9]

### C. Defective Workmanship under the Contract

As outlined above, paragraph three also details certain situations as "LOSSES NOT INSURED." Defendant points to the following "loss" detailed in this paragraph:

---

[9] Defendant relies on *Hayley v. Allstate Ins. Co.*, 686 N.W.2d 273 (Mich. Ct. App. 2004). Although the contract in that case had the same initial language, the court did not mention the final sentence that this Court found conflicts with that initial language.

  b. defect, weakness, inadequacy, fault or unsoundness in:

   (1) planning, zoning, development, surveying, siting;
   (2) design, specifications, workmanship, construction, grading, compaction;
   (3) materials used in construction or repair; or
   (4) maintenance;

  of any property (including land, structures, or improvements of any kind) whether on or off the residence premises . . . .

(Form FP-7955 at 11.)

Plaintiffs' complaint alleges that "[a]s a result of Sunglo's breach of care in rendering services" they have sustained harm which includes "toxic mold related disease as well as financial losses . . . ." (Compl. ¶ 11.) In other words, according to the complaint, the defective workmanship resulted in mold which, in turn, caused injury and damages that were covered under the contract.

The above example explicitly eliminates a "defect" or "inadequacy" of "workmanship, construction" or "maintenance" as a "loss" that is covered under the contract. As noted above, however, the final sentence of paragraph three provides that Defendant does insure "for any resulting loss" from one of the exceptions "unless the resulting loss is itself a Loss Not Insured by this Section." (Form FP-7955 at 11.) It is not clear, as detailed in the previous section, whether the damages caused by moss are also excludable pursuant to the first paragraph of the "LOSSES NOT INSURED" section. Thus, summary judgment is not appropriate.

### D. Water Damage under the Contract

Similar to its previous two arguments, Defendant contends that the clause dealing with water seepage precludes Plaintiffs' claim for damages. Specifically, one of the exclusions

from paragraph one includes "continuous or repeated seepage or leakage of water or steam from a . . . plumbing system . . . ." (Form FP-7955 at 9.) It is not disputed that Plaintiffs had a problem with water leakage. Defendant has not shown, however, that water seepage was the cause of the mold. Thus, summary judgment cannot be granted.

## IV. Conclusion

For the reasons stated above, the Court hereby orders that Defendant's motion for summary judgment is DENIED.

SO ORDERED.


       s/Nancy G. Edmunds
       Nancy G. Edmunds
       United States District Judge

Dated: June 17, 2005

I hereby certify that a copy of the foregoing document was served upon counsel of record on June 17, 2005, by electronic and/or ordinary mail.

       s/Carol A. Hemeyer
       Case Manager